FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

00 JAN -5 PM 1:05

U.S. DISTRICT COURT
N.D. OF ALABAMA

JONATHAN M. ROSE and            )
KIMBERLY N. ROSE,               )
                                )
        Plaintiffs,             )
                                )
vs.                             )   Civil Action No. CV-98-S-2047-NE
                                )
GENERAL MOTORS CORPORATION      )                      ENTERED
and MARVIN BUNDY,               )
                                )                   ·JAN - 5 2000
        Defendants.             )

## MEMORANDUM OPINION

This action is before the court on the motion for summary

judgment of defendant General Motors Corporation (Doc. No. 23),

plaintiffs' motion to strike supplemental declarations filed by

General Motors (Doc. No. 38), General Motors' motion to file a

reply brief (Doc. No. 40), and plaintiffs' motion to strike General

Motors' reply brief (Doc. No. 41). Upon consideration of the

motions, briefs, evidentiary submissions, and pleadings, this court

finds that the motion for summary judgment is due to be granted,

the motion to strike supplemental declarations is due to be denied,

the motion for leave to file a reply brief is due to be denied, and

the motion to strike the reply brief is due to be denied as moot.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant

part, that summary judgment not only is proper, but "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve

2

all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the

3

evidence presents a sufficient disagreement to require submission
to a jury or whether it is so one-sided that one party must prevail
as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at
2512.

With the foregoing standards in mind, the following facts
either are not disputed, or are stated in a light most favorable to
plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff Jonathan Rose and defendant Marvin Bundy were
employed by defendant General Motors Corporation at all times
relevant to this lawsuit. Rose and Bundy worked at the Delphi
Automotive Systems ("Delphi") plant in Limestone County, Alabama.
(*See* Complaint ¶¶ 8-9, attached as Exhibit "A" to defendant General
Motors' notice of removal (Doc. No. 1).) During the time relevant
to this action, Delphi was a division of General Motors.[1]   Rose
began working at the Delphi facility in 1981.  (*See* Rose depo. at

---

[1]   Counsel for General Motors Corporation notes that Delphi now is a
separate corporation, and should be considered the actual defendant for purposes
of this case.  (*See* Brief in support of defendant General Motors' motion for
summary judgment (Doc. No. 28), at 1 n.1).  Because substitution of parties has
not occurred in accordance with Federal Rule of Civil Procedure 25(c), this court
deems General Motors the proper defendant in ruling upon these motions.

4

28.) Bundy commenced employment there in 1978.[2] (*See* Defendant General Motors' evidentiary submissions in support of motion for summary judgment (Doc. No. 26), at Exhibit "B.")

Rose and Bundy were members of the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and were represented by UAW in their dealings with Delphi management. (*See* John Morris affidavit ¶ 3.) Accordingly, Rose and Bundy were subject to the terms of a national collective bargaining agreement between General Motors and UAW ("the National CBA"). (*See id.*)

Rose and Bundy began working together as rotor inspectors in the Delphi plant sometime during 1995. Until then, they were not acquainted, because each previously had worked either in different departments or on different shifts within the same department. Rose stated that he and Bundy initially "[g]ot along real good," so much so that they would have lunch together "almost every day." (Rose depo. at 91, 90.) The relationship between Rose and Bundy changed dramatically on July 16, 1996, however. Rose alleges that Bundy viciously attacked him on that day. (*See* Complaint ¶ 12.)

---

[2] Bundy worked at a Delphi facility in Illinois from 1978 to 1984, and was transferred to the Delphi plant in Limestone County on April 30, 1984. (*See* Defendant General Motors' evidentiary submissions in support of motion for summary judgment (Doc. No. 26), at Exhibit "B.")

5

The facts surrounding the altercation reveal that Rose had been informed of certain statements made by Bundy a few days earlier. Bundy had told another co-worker, Gena Cooper, that he hated all the "bastards" he worked with. (Rose depo. at 94.) When Bundy approached Rose at his workstation on July 16th, Rose confronted Bundy, saying "if you hate all us bastards, just go on back to your workstation ...." (Id. at 104.) Bundy retorted that he was going to "kick [Rose's] ass" before the end of the day. (Id.) Rose's last memory of what next occurred was his effort to calm Bundy down, by touching him on the shoulder. (See id.) Rose next remembers being placed in an ambulance. (See id. at 105.)

The altercation resulted in a variety of injuries to Rose, including a chin laceration, a head contusion that required stitches, a severe concussion, whiplash, chest bruises, and a blood clot in his chest cavity. (See id. at 113, 115.) Rose has recovered from the majority of these injuries,[3] but he sometimes takes Darvocet to soothe pain. (See id. at 10.)

Both Rose and Bundy were disciplined pursuant to local "shop rules" for their involvement in the altercation.[4] Bundy was

---

[3] Rose still has the blood clot in his chest cavity. (See Rose depo. at 142.)

[4] The "shop rules" of the Delphi plant provided an elaborate system of progressive discipline, as the following summary suggests:

6

suspended for two weeks effective immediately, and Rose was

suspended for two weeks upon his return to work after recovering

from his injuries. Bundy filed a grievance with the union relating

to General Motors' disciplinary action on July 17, 1996. Rose

filed a similar grievance on July 29, 1996. Both grievances were

---

Violations of the shop rules contained in the collective
bargaining agreements in effect at GM's Athens, Alabama facility are
dealt with pursuant to GM's progressive steps of discipline.
Generally, for a first violation of a shop rule with a clean
disciplinary record, an employee would be assessed a written
warning. For a second violation within a year, an employee would be
placed on disciplinary layoff for the balance of the shift during
which the violation occurred plus three days. For a third violation
within a year of the second violation, an employee would be placed
on disciplinary layoff for the balance of the shift during which the
violation occurred plus one week. For a fourth violation within a
year of the third violation, an employee would be placed on
disciplinary layoff for the balance of the shift during which the
violation occurred plus two weeks. For a fifth violation within a
year of the fourth violation, an employee would be placed on
disciplinary layoff for the balance of the shift during which the
violation occurred plus thirty days. For a sixth violation within
a year of the fifth violation, an employee would be discharged.
        Where an employee is involved in a fight or physical attack or
altercation, and the employee has a clean disciplinary record, the
employee would be subject to progressive steps of discipline
beginning with a disciplinary layoff for the balance of the shift
plus two weeks. ...

(John Morris affidavit Exhibit "B," at 2-3 (emphasis supplied).) The Fourth
Circuit discussed the interplay between collective bargaining agreements and
"shop rules," such as those set forth above, in *McCormick v. AT&T Technologies,
Inc.*, 934 F.2d 531 (4th Cir. 1991):

    The specifics as to management conduct ... need not be spelled out
    in all their detail and refinement for the collective bargaining
    agreement to be applicable. Rather, the collective bargaining
    agreement consists, in addition to its express provisions, of an
    "industrial common law—the practices of the industry and the
    shop—[which] is equally a part of the collective bargaining
    agreement although not expressed in it."

*Id.* at 536 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation
Company*, 363 U.S. 574, 581-82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960)).

7

settled successfully by union and management representatives. (*See* Defendant General Motors' notice of removal at Exhibit "B.")

Bundy's prior work history at Delphi reveals other instances of violent and irrational behavior. He had been disciplined formally on two separate occasions, in December of 1991, for using abusive language toward a superior, and in March of 1993, for using abusive language toward a co-worker. (*See* John Morris affidavit ¶ 7(a)-(b).) Rose also noted that Bundy harassed other co-workers within their department, particularly Mike Hancock. (*See* Rose depo. at 80.) Bundy allegedly slapped Hancock in the back of the head on one occasion, and pushed him nearly to the ground on another. (*See id.* at 82.) While Rose informed his supervisors, Tommy Jones and Kent Bevill, of this conduct by Bundy,[5] apparently neither he nor Hancock filed a formal grievance with the union or formal complaint with General Motors. (*See id.* at 87-88.)

---

[5] Rose told his supervisors after he witnessed Bundy slap Hancock that "somebody needed to be moved." (Rose depo. at 83.) Rose told his supervisors after he witnessed Bundy push Hancock that "somebody's going to have to get moved before somebody gets hurt." (*Id.* at 87.) Rose contends that his supervisors said "that they were working on it." (*Id.* at 88.)

Hancock's affidavit corroborates the statements made by Rose to General Motors management regarding its knowledge of Bundy's violent demeanor. After Bundy threatened Hancock with physical harm, Hancock "personally reported Bundy's acts to Tommy Jones," who "assured [Hancock] that he was aware of Bundy's threatening behavior and promised [Hancock] that '[management] are [*sic*] working on trying to get [Bundy] out.'" (Michael Hancock affidavit at 1.) Hancock concludes that "management of this plant absolutely knew that Bundy was a bully and a threat to the physical welfare of every worker in the plant." (*Id.*)

8

Rose and his wife sued General Motors and Bundy in the Circuit Court of Limestone County, Alabama, on July 8, 1998.[6]  The five claims asserted in that action arose out of the altercation between Rose and Bundy: (1) assault and battery solely against Bundy; (2) *respondeat superior* solely against General Motors; (3) negligence solely against General Motors; (4) negligent hiring and retention solely against General Motors; and (5) loss of consortium against both defendants.

General Motors removed the state court action to this court on August 12, 1998,[7] asserting that plaintiffs' claims implicated a federal question under section 301 of the Taft-Hartley Labor Management Relations Act, 29 U.S.C. § 185.[8]  General Motors argued

---

[6] Additionally, the State of Alabama prosecuted Bundy for second degree assault in connection with the altercation occurring on July 16, 1996.  *See State of Alabama v. Bundy*, Case No. CC 96-405 (Limestone County Cir. Ct. Mar. 12, 1997) (trial transcript attached as Exhibit "1" to plaintiffs' evidentiary submissions in opposition to defendant's motion for summary judgment (Doc. No. 33)). Plaintiffs note in their brief that Bundy accepted a plea bargain for assault in the third degree. (*See* Plaintiffs' brief in opposition to defendant's motion for summary judgment (Doc. No. 34), at 2.)

[7] The court reviewed the notice of removal and concluded it was without defect.  Specifically, General Motors removed within 30 days of being served with plaintiffs' complaint and was the only defendant properly served as of the date of removal. (*See* Defendant General Motors' notice of removal ¶ 2.)

[8] 29 U.S.C. § 185(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy and without regard to the citizenship of the parties.

9

that plaintiffs' claims against it hinged on interpretation of the

National CBA, which regulates proceedings between General Motors

and union members like Rose and Bundy.

General Motors converted the arguments set forth in the notice

of removal into a motion for summary judgment.  It contends that,

because plaintiffs failed to amend their complaint to reflect a

claim under 29 U.S.C. § 185, their state law claims are preempted,

and due to be dismissed.

### III. DISCUSSION

**A.   Relevant Provisions of the National CBA**

The National CBA contains several clauses directly relevant to

this action.  The first, located at paragraph 8, is a "management

rights" clause:

> The right to hire; promote; <u>discharge or discipline for
> cause</u>; and to maintain discipline and efficiency of
> employees, is the sole responsibility of the Corporation
> except that Union members shall not be discriminated
> against as such.    In addition, the products to be
> manufactured, the location of the plants, the schedules
> of production, the methods, processes and means of
> manufacturing   are   solely   and   exclusively   the
> responsibility of the corporation.

Paragraph 76(a) governs the rights of union members when they are

faced with such disciplinary action:

> When a suspension, written reprimand, layoff or discharge
> of an employee is contemplated, the employee, where
> circumstances permit, will be offered an interview to

10

> allow for answering the charges involved in the situation
> for which such discipline is being considered before
> being required to leave the plant. Employees who, for
> the purpose of being interviewed concerning discipline,
> are called to the plant, or removed from their work to
> the supervisor's desk or to an office, will be advised
> that they may, if they so desire, request the presence of
> their District Committeeperson [a union official] to
> represent them during such interview.

Another relevant provision concerns the transfer of employees.

Paragraph 63 of the National CBA provides, in relevant part:

> The transferring of employees is solely the
> responsibility of Management subject to the following
> sub-paragraphs. The provisions of this paragraph shall
> be applied without discrimination because of race,
> religion, color, age, sex or national origin, so that
> equal opportunity will be afforded to all employees.
>
> . . .
>
> It is the policy of Management to cooperate in every
> practical way with employees who desire transfers to new
> positions or vacancies in their department. Accordingly,
> such employees who make application ... will be given
> preference for openings in their department ....
>
> . . .
>
> Any claim of personal prejudice or any claim of
> discrimination for Union activity in connection with
> transfers may be taken up as a grievance. Such claims
> must be supported by written evidence submitted within 48
> hours from the time the grievance is filed.

(Defendant General Motors' supplement to declaration of John Morris

(Doc. No. 27) (emphasis supplied).) In its entirety, the National

CBA creates an elaborate regulatory structure that impacts

11

virtually all aspects of a union member's employment with General Motors. Not only does the National CBA define rights and duties of union members, it also dictates the procedures General Motors must follow when ensuring that its union-affiliated employees understand those rights and fulfill those duties.

**B.    General Considerations under 29 U.S.C. § 185**

Section 301 of the Taft-Hartley Labor Management Relations Act, 29 U.S.C. § 185, ensures that federal labor law principles apply uniformly throughout the country. *See Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 405-06, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988). To that end, the Supreme Court has drawn the following conclusion in interpreting 29 U.S.C. § 185:

> [I]f the resolution of a state-law claim depends upon the meaning of a collective bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute.

*Id.* While the Supreme Court admitted that not every state law claim "tangentially involving" a collective bargaining agreement provision falls under the ambit of section 301, its message is clear: When resolution of a state law claim is substantially dependent on analysis of the terms of a collective bargaining

12

agreement, federal law preempts state law. *See id.* at 413 n.12,
108 S.Ct. at 1885 n.12 (citation omitted).

C.     **The Elements of Plaintiffs' State Law Claims against General Motors**

Thus, the question of whether section 301 preempts a state law
claim necessarily depends on analysis of the elements of that
claim. *See Lightning v. Roadway Express, Inc.*, 60 F.3d 1551, 1557
(11th Cir. 1995). Should resolution of those elements
substantially depend upon interpretation of the terms of a
collective bargaining agreement, the individual state law claim is
preempted. *See id.* (holding that claim of intentional infliction
of emotional distress under Georgia law is not preempted by section
301, based on a review of the elements of that state law claim).

Plaintiffs allege the following separate, albeit related,
claims against General Motors under the law of the State of
Alabama: *respondeat superior*, negligence, and negligent hiring and
retention. The loss of consortium claim asserted by Kimberly N.
Rose is derivative of these.

1.     *Respondeat superior*

Rose seeks to hold General Motors vicariously liable for
Bundy's assault: "GM knew, or should have known, of Bundy's violent
tendencies and even though GM had this knowledge or should have had

13

this knowledge, it continued to employ him." (Complaint ¶ 18.)

The Supreme Court of Alabama delineated the situations where

an employer may be held liable for the intentional torts of an

employee in *Mardis v. Robbins Tire & Rubber Company*, 669 So. 2d 885

(Ala. 1995):

> [T]he plaintiff must offer evidence (1) that the agent's
> wrongful acts were committed in the line and scope of the
> agent's employment; or (2) that the acts were committed
> in furtherance of the business of the employer; or (3)
> that the employer participated in, authorized, or
> ratified the wrongful acts. The employer is directly
> liable if it authorizes or participates in the employee's
> acts or ratifies the employee's conduct after it learns
> of the action.

*Id.* at 889 (citations omitted). Rose claims that General Motors'

prior knowledge of Bundy's violent demeanor necessitates the

conclusion that it "authorized" or "ratifie[d] the employee's

conduct after it learn[ed] of the" assault. *Id.* The *Mardis* court

elaborated on that aspect of vicarious liability:

> In order to show that [the employer] ratified [the
> agent's] conduct, [the plaintiff] must show that [the
> employer] expressly adopted [the agent's] behavior or
> that [the employer] implicitly approved of it. ... [I]n
> addition to proving the underlying tortious conduct of an
> offending employee, a complaining employee must show that
> the employer (1) had actual knowledge of the tortious
> conduct of the offending employee and that the tortious
> conduct was directed at and visited upon the complaining
> employee; (2) that based upon this knowledge, the
> employer knew, or should have known, that such conduct
> constituted ... a continuing tort; and (3) that the

14

> employer failed to take "adequate" steps to remedy the
> situation.

*Id.* at 889 (emphasis supplied) (citations omitted).

### 2.    Negligent failure to provide a safe work environment

Rose bases his general negligence claim on the theory that
General Motors' failure to adequately supervise employees like
Bundy led to the creation of a unsafe workplace: "GM had a duty to
properly supervise Bundy, and in failing to do so, created a
workplace where individuals, like Jonathan Rose, could suffer
grievous injury." (Complaint ¶ 21.)

In *Kelley v. Worley*, 29 F.Supp.2d 1304 (M.D. Ala. 1998), Chief
Judge Albritton observed "that claims for negligent failure to
provide a safe workplace have traditionally been brought in the
factual context of unsafe machinery or hazardous conditions in the
workplace which cause physical injuries to employees." *Id.* at 1313
(addressing negligence claim grounded on employer's failure to
prevent the sexual harassment of plaintiff by one of its agents).
While "uncertain as to whether sexual harassment can qualify as a
breach of the employer's duty to maintain a safe workplace under
Alabama law," Chief Judge Albritton assumed *arguendo* that such a
claim could be advanced. (This court notes that an intentional
tort, like the assault committed by Bundy, is analogous to sexual

15

harassment in the context of an unsafe work environment claim.)

Chief Judge Albritton then captured the general parameters of a

claim based on negligent failure to provide a safe workplace:

> Under the common law, an employer has a duty to supply
> the employee with a reasonably safe place to work. The
> employer is held to that degree of care which reasonable
> and prudent men exercise in their own affairs, or the
> care and diligence which a man of ordinary care and
> prudence would exercise for his own protection, or the
> protection of his property. Accordingly, it is the duty
> of the employer to exercise reasonable care to warn the
> employee of any risk of harm and to acquaint him with any
> dangerous features of the equipment, premises, or
> procedures with which he works. <u>This includes the duty
> to take reasonable steps, when viewed in relation to the
> degree of the risk, to guard against injury to the
> employee from that risk</u>.

*Id.* at 1313-14 (emphasis supplied) (holding that the employer could

not be deemed negligent in failing to provide a safe workplace,

because it provided an effective anti-harassment policy).

### 3. Negligent hiring and retention

Rose's third negligence-based claim against General Motors

lies in its alleged failure to terminate Bundy, based upon the

knowledge of his past violent acts: "Bundy has a history of

violence, occurring in the form of hostile behavior, both verbal

and physical, and GM had, or should have had, knowledge of such

behavior. ... Even though Bundy was probably and obviously a

violent personality, GM hired, transferred, retained, defended, and

16

protected Bundy." (Complaint ¶¶ 23-24.) Plaintiffs do not allege
facts to support any argument that General Motors knew, or should
have known, of Bundy's violent demeanor on the initial date of
hiring, which was in 1978. Thus, plaintiffs' allegations are best
addressed in the framework of negligent retention.

A negligent retention claim is akin to a claim for negligent
supervision, which also was addressed by the Supreme Court of
Alabama in *Mardis v. Robbins Tire & Rubber Company*, 669 So. 2d 885
(Ala. 1995).

> [T]he master is held responsible for the servant's
> incompetency when notice or knowledge, either actual or
> presumed, of the incompetency has been brought to the
> master.   For the master to be held liable for the
> servant's incompetency, it must be affirmatively shown
> that had the master exercised due and proper diligence,
> the master would have learned of the incompetency.  This
> may be done by showing specific acts of incompetency and
> showing that they were brought to the knowledge of the
> master, or by showing them to be of such a nature,
> character, and frequency that the master, in the exercise
> of due care, must have had notice of them.

*Id*. at 889 (emphasis supplied).  Because the term "retention"
indicates that an employer erred by keeping a particular employee
on the workforce, the negligent supervision elements sketched by
the *Mardis* opinion must be amended in the following manner:   A
plaintiff must show not only that an employer was aware, or should
have been aware, of an employee's conduct, but also that an

17

employer failed to take appropriate steps to remedy the problem.
The elements of a negligent retention claim parallel those of a
*respondeat superior* claim under the "adoption" or "ratification"
theory, discussed *supra* in section III.C.1.

## D. Is Section 301 Applicable to Plaintiffs' Negligence Claims against General Motors?

These claims — *respondeat superior*, negligent failure to
provide a safe workplace, and negligent retention of Bundy — have
a common element: Plaintiffs must show that General Motors failed
to take adequate or reasonable steps to prevent the commission of
further intentional torts by Bundy, upon being informed of his
violent demeanor. *See Mardis*, 669 So. 2d at 889 (employer is
accountable on *respondeat superior* theory when it fails to take
adequate steps to remedy a situation after being informed of
wrongdoing); *Kelley*, 29 F.Supp.2d at 1314 (employer negligently
creates an unsafe workplace when it fails to take reasonable steps
to guard against injury); *Mardis*, 669 So. 2d at 889 (employer
liable for negligent retention when it fails to exercise "due and
proper diligence" in recognizing and remedying inappropriate
conduct by an employee).

The evidentiary submissions do not define precisely the notice
afforded to General Motors' supervisors on the issue of Bundy's

18

violent demeanor. This court assumes supervisors Tommy Jones and
Kent Bevill were aware of certain hostile acts by Bundy against
other employees in the workplace, particularly Mike Hancock, before
July 16, 1996.    This court further assumes these individuals
understood statements made by Bundy's co-workers that it was
necessary to transfer either Bundy or other co-workers, in order to
avoid further acts of violence. The deposition testimony of Rose
and the affidavit submitted by Mike Hancock reflect this point.

     Thus assuming that General Motors' supervisory agents were
aware of Bundy's violent propensities before July 16, 1996, the
relevant question becomes whether General Motors took reasonable
steps to guard against Bundy's assault of Rose. Resolution of that
question ultimately turns on an interpretation of the National CBA.
Interpretation of that agreement is necessary for the court to
evaluate issues such as what remedial measures were available to
General Motors, whether any of these measures were implemented, and
whether General Motors' treatment of Bundy was adequate given the
circumstances of this case. *See McCormick v. AT&T Technologies,
Inc.*, 934 F.2d 531, 536 (4th Cir. 1991) (noting that "[t]he
circumstances that must be considered in examining management's
conduct are not merely factual, but contractual, and the collective

19

bargaining  agreement  is  a  crucial  component  of  these
circumstances").

Rose alleges implicitly that General Motors' failure to
transfer Bundy out of his department before the assault amounted to
negligence. (Complaint ¶ 24.) The National CBA indicates, in
paragraph 63, that transfer decisions are solely the responsibility
of General Motors. That paragraph goes on to note, however, that
"[a]ny claim of personal prejudice ... in connection with transfers
may be taken up as a grievance." That is, Bundy had the right to
file a grievance with the union if General Motors acted on the
requests made by Rose and Hancock that he be transferred. In past
disciplinary actions against Bundy, he had pursued persistently his
right to file grievances.[9] Thus, the National CBA guides whether
General Motors' decision not to transfer Bundy was negligent, in
the sense that the decision demonstrated a failure to take adequate
or reasonable steps. See Smith v. Saginaw Steering Gear, Civil
Action No. CV-95-B-373-S, at 10 (N.D. Ala. Oct. 15, 1996)
(Blackburn, J.) (construing identical National CBA and noting that

---

[9] Bundy filed four grievances relating to discipline taken by General
Motors for his use of abusive language toward a member of management in December
of 1991. (See John Morris affidavit ¶ 7(a), Exhibit 3.) Bundy promised not to
file a grievance relating to disciplinary action taken by General Motors for his
use of abusive language toward a co-worker in March of 1993, in exchange for the
removal of a written warning placed in his file. (See id. ¶ 7(b), Exhibit 4.)

20

any transfer action taken by employer "would have to be within the confines of the CBA, or [the employer] would risk incurring liability to [the union-affiliated plaintiff] under the CBA"), *aff'd*, 132 F.3d 1460 (11th Cir. 1997) (table).

Similarly, the power to discipline or discharge rests firmly with General Motors under paragraph 8 of the National CBA. The key phrase within this paragraph, however, is "for cause." Rose's contention that General Motors did not take adequate or reasonable steps in preventing the assault depends on the argument that "cause" existed before that time to discipline or discharge Bundy for his violent demeanor. Thus, a question arises under the National CBA regarding whether Rose and Hancock's informal complaints[10] to their supervisors about Bundy's conduct afforded General Motors sufficient "cause" to discipline, much less to

---

[10] Even if Rose and Hancock had filed formal grievances based on Bundy's treatment of Hancock, paragraph 76b of the National CBA would have impacted General Motors' analysis of the appropriate level of discipline toward Bundy, if any:

Employees will be tendered a copy of any warning, reprimand, suspension or disciplinary layoff entered on their personnel records, within three days of the action taken. In imposing discipline on a current charge, Management will not take into account any prior infractions which occurred more than three years previously nor impose discipline on employees for falsification of their employment applications after a period of twelve (12) months from their date of hire.

Because consideration of this paragraph, as well as others in the National CBA, would have guided General Motors in its assessment of discipline toward Bundy, this court would be required to interpret the reasonableness of actions taken pursuant to those paragraphs.

21

discharge, Bundy.[11]

It is clear that the National CBA is "inextricably intertwined" with plaintiffs' negligence claims. *Allis-Chalmers Corporation v. Lueck*, 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985). The key question in this case is whether General Motors had authority under the National CBA to take the steps Rose claims it should have taken against Bundy before the assault occurred. If the disciplinary activity requested by Rose and Hancock failed to comport with what is permissible under that agreement, it does not follow that General Motors' failure to transfer, discharge, or otherwise discipline Bundy was inadequate or unreasonable. In sum, a determination of the actions permissible for General Motors to take under the National CBA

---

[11] A concise statement of the importance of a collective bargaining agreement in management's decision to exact punishment is found in *Underwood v. Red Star Yeast & Products*, 1999 WL 430138 (N.D. Cal. June 21, 1999):

> In determining whether [defendant] was negligent in failing to terminate or otherwise discipline [the employee who assaulted plaintiff], a court would necessarily have to construe the terms of the CBA in order to see whether [defendant] could have terminated [that employee], or imposed some other form of discipline, consistently with its contractual obligations under the CBA.

*Id.* at *3 (concluding that plaintiff's state law claim for intentional infliction of emotional distress was preempted by section 301).

The intricate "shop rules," recited at note 4 *supra*, illustrate the strict criteria General Motors faces when contemplating discharge, or even strong discipline, of a union member like Bundy. See also paragraph 76(a) of the National CBA at page 11 *supra*, which grants union members an interview to allow for answering the charges involved in the situation for which such discipline is being considered before being required to leave the plant.

22

comprises a threshold issue in the analysis of whether it was in fact negligent in regard to Bundy's assault of Rose.

## IV. CONCLUSION

Accordingly, all of plaintiffs' negligence claims are preempted under section 301 of the Taft-Hartley Labor Management Relations Act. Plaintiffs' failure to amend their complaint to reflect this preemption warrants dismissal of the negligence claims.[12] Also, the loss of consortium claim advanced by Kimberly N. Rose against General Motors is due to be dismissed, because it is derivative of the negligence claims. *See Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620, 625 (8th Cir. 1989) ("When an injured party cannot recover [due to preemption], the spouse claiming loss of consortium is also barred as a matter of law from recovery under that claim.") Thus, the only counts remaining from plaintiffs' original complaint are the assault and battery and loss of consortium claims against Bundy.

The independent basis for federal jurisdiction over this

---

[12] The court recognizes that plaintiffs only had six months from the date of the assault to assert a claim under section 301 of the Taft-Hartley Labor Management Relations Act. *See DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 155, 103 S.Ct. 2281, 2285, 70 L.Ed.2d 476 (1983) (holding that employee's action against employer for breach of collective bargaining agreement, under 29 U.S.C. § 185, was subject to six month statute of limitations set forth in 29 U.S.C. § 160(b)). Thus, the statute of limitations on any potential claim under section 301 ran long before plaintiffs filed their lawsuit in July of 1998.

23

action dissolves based on the findings made today. Accordingly,
under 28 U.S.C. § 1367(c),[13] this court is of the opinion that this
action should be remanded to the Circuit Court of Limestone County,
Alabama, for resolution of plaintiffs' claims against Bundy. *See
Carnegie-Mellon v. Cohill*, 484 U.S. 343, 357, 108 S.Ct. 614, 623,
98 L.Ed.2d 720 (1988) ("We conclude that a district court has
discretion to remand to state court a removed case involving
pendent claims upon a proper determination that retaining
jurisdiction over the case would be inappropriate."); *see also
Graham v. State Farm Mutual Insurance Company*, 193 F.2d 1274, 1282
(11th Cir. 1999).[14]   An order consistent with this memorandum
opinion shall be entered contemporaneously herewith.

---

[13] 28 U.S.C. § 1367(c)(3) provides that "[t]he district courts may decline
to exercise supplemental jurisdiction over a claim under subsection (a) if ...
the district court has dismissed all claims over which it has original
jurisdiction ...."

[14] The Eleventh Circuit noted in *Graham*:

> Because this court's jurisdiction over plaintiff's state law claims
> depends on the viability of her claims under the FMLA, the court
> will address the claims over which it has original jurisdiction
> before proceeding to consider, if necessary, the state law claims.
> If no federal claim survives summary judgment, the court sees no
> reason why the other claims should not be dismissed or remanded
> pursuant to 28 U.S.C. § 1367(c)(3).

*Graham*, 193 F.3d at 1282.

24

DONE this 5ᵗʰ day of January, 2000.

_____

United States District Judge

25